**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

| | |
|---|---|
| AFRICA N. WHITFIELD, | : Case No. 3:18-cv-00108 |
| Plaintiff, | : |
| vs. | : District Judge Thomas M. Rose |
| | : Magistrate Judge Sharon L. Ovington |
| COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, | : |
| Defendant. | : |

# REPORT AND RECOMMENDATIONS[1]

## I. Introduction

The Social Security Administration provides Supplemental Security Income to "disabled" individuals. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. § 1382(a). A disability in this context means "any medically determinable physical or mental impairment" that precludes an applicant from engaging in "substantial gainful activity." 42 U.S.C. § 1382c(a)(3)(A); *see Bowen,* 476 U.S. at 469-70.

On February 28, 2014, Plaintiff Africa N. Whitfield protectively filed[2] for Supplemental Security Income asserting that starting in 2008, her psychological problems amounted to one or more disabilities. Administrative Law Judge (ALJ) Gregory G.

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

[2] A protective filing date is the date an applicant first contacted the Social Security Administration to inquire about filing for disability benefits. It may be used to establish an earlier application date than the date the Social Security Administration actually received the claimant's signed application. *See* http://www.ssa.gov/glossary.

Kenyon found that Plaintiff did not have a disability and denied her application for benefits.

Plaintiff now appeals ALJ Kenyon's decision. She argues, in part, that he failed to adhere to the treating physician rule when weighing the opinions of her treating psychiatrist Mark Reynolds, M.D. and the opinions of her treating counselors.

The Commissioner argues that the ALJ reasonably weighed the medical source opinions and that substantial evidence supports the ALJ's decision.

## II. Background

### A. **Plaintiff and Her Testimony**

Plaintiff was a "younger" person (forty-one years old) on the date she protectively filed her application. *See* 20 C.F.R. § 416.963(c). She earned a high-school GED. Although she held, at times, various short-term jobs, *see* Doc. #7, *PageID* #s 252-57, she does not have any past relevant work experience. *Id*. at 68.

Plaintiff's challenges to the ALJ's decision focus on his review of the medical evidence and her testimony about her mental-health impairments. She testified during an administrative hearing that she has been diagnosed with bipolar disorder. She experiences a lot of mood swings with depression most of the time and frequent anxiety. *Id*. at 89. Her anxiety involves panic attacks. She explained, "It's when I'm out of my home for an amount of time or around a crowd of people and I feel like I get overwhelmed." *Id*. at 90. When she gets overwhelmed, her heart beats fast and she gets sweaty. Rather than interacting with people, she stays quiet most of the time. Pressure or stress will also cause her to have panic attacks. *Id*. at 99.

Plaintiff does not use bus transportation but is able to go to her appointments at South Community Behavioral Health (South Community) because they will pick her up. They also take her to the grocery store, the bank, or any place she needs to go. *Id*. at 91, 95. She does not have friends that she socializes with except for friends on social media. Friends do not visit her. *Id*. at 91. Depression decreases her ability to socialize and her appetite. *Id*. at 98.

Plaintiff has anger and irritability issues associated with her bipolar disorder. In past jobs, she had difficulty working with coworkers. She would get into verbal situations and "sometimes almost physical [situations]." *Id*. She would get angry when someone criticized her work. *Id*. at 99.

Six months before the ALJ's hearing (held in July 2016), Plaintiff was hearing things. But this had not occurred since February 2016. She sometimes feels paranoid—as if someone was going to hurt her. *Id*. at 92-93.

Plaintiff told the ALJ that she spends an ordinary day in bed—just about all day long. This occurs because she is depressed most of the time and can't find the motivation to get out of bed. She spends five days out of seven like this. She sleeps about four hours a night. *Id*. at 95-96. She speaks daily with her case manager at South Community either by phone or appointment. Her case manager sometimes visits her at her home. Once a month, Plaintiff also attended hourly counseling sessions at South Community. *Id*. at 101.

**B.** **<u>Medical Evidence</u>**

*South Community Behavioral Health*

Plaintiff began mental-health treatment at South Community in 2004 and continued there at least through the ALJ's decision and start of this case. *See* Doc. #8, *PageID* #3027 (and citations therein). She has been diagnosed with bipolar disorder, depression, and anxiety. In addition to counseling and group therapy, her treatment includes medications—Amitriptyline, Diphenhydramine, Topomax, and a monthly injection of Invega. Plaintiff's counsel describes these medications with appropriate citations. *See id.* at nn. 1-4.

### *Cynthia Van Ausdal, RN, MSN, CNS and Dr. Reynolds*

The parties agree that Cynthia Van Ausdal is an Advance Practice Registered Nurse. Plaintiff explains that Van Ausdal is certified in adult psychiatry. Van Ausdal treats Plaintiff at South Community. In April 2014, Van Ausdal completed and signed a questionnaire. Treating psychiatrist Dr. Reynolds later signed the same questionnaire thus indicating his agreement with the information and opinions Van Ausdal provided. (Doc. #7, *PageID* #s 3064-69).

Van Ausdal reported that Plaintiff's treatment frequency was every four weeks, but it had been five months since her last visit to South Community. *Id*. at 3064. Plaintiff's diagnoses consisted of bipolar II disorder, anxiety (not otherwise specified). Van Ausdal explained, "client experiences episodes of mood instability & audio and visual hallucinations as well as episodes of anxiety and panic." *Id*. Plaintiff was "enrolled in intensive dual diagnosis program to address issues of chemical dependency." *Id*. Her prognosis was guarded because she often refused to answer her door or phone when South Community staff members visit her. And Plaintiff states that she is too depressed to interact with others. *Id.*

4

Van Ausdal's checkmarks indicate that Plaintiff has a profusion of positive clinical findings—namely, poor memory, sleep disturbance, personality change, mood disturbance, emotional lability, delusions or hallucinations, substance dependence, recurrent panic attacks, pervasive loss of interest, psychomotor retardation, feelings of guilt and worthlessness, difficulty thinking or concentrating, suicidal ideation or attempts, social withdrawal or isolation, blunt, flat or inappropriate affect, decreased energy, intrusive recollections of a traumatic experience, generalized persistent anxiety, and hostility and irritability. *Id.* at 3065.

Van Ausdal opined that Plaintiff was moderately limited in her ability to make simple work-related decisions. She thought Plaintiff was markedly limited in her ability to:

- complete a normal workweek without interruptions from psychologically based symptoms,

- maintain socially appropriate behavior,

- interact appropriately with the general public,

- ask simple questions or request assistance,

- accept instructions and respond appropriately to criticism from supervisors,

- get along with co-workers or peers without distracting them or exhibiting behavioral extremes,

- travel to unfamiliar places or use public transportation,

- set realistic goals or make plans independently, and

- respond appropriately to changes in the work setting.

*Id*. at 3066-67.  Van Ausdal estimated that Plaintiff would be absent from work more than three times a month on average due to her impairments or treatment.  *Id*. at 3069.

Van Ausdal also handwrote (rather than checkmark) her opinion that Plaintiff was markedly limited by her minimal support system and her inability to respond to intervention due to anxiety and isolation.  *Id*. at 3067.

### *Yvonne Luneke, PA-C and Dr. Reynolds*

In June 2015, Luneke completed a questionnaire that both she and Dr. Reynolds signed.  *Id*. at 2411-15.  Luneke documented diagnoses of bipolar disorder, alcohol abuse in full remission, and anxiety.  *Id*. at 2411.  Luneke's checkmarks identify Plaintiff's signs and symptoms as depressed mood; persistent or generalized anxiety; feelings of guilt and worthlessness; hostility or irritability; suicidal ideation; difficulty thinking or concentrating; intrusive recollections of a traumatic experience; paranoia; persistent irrational fears; pervasive loss of interests; appetite disturbances; decreased energy; impulsive or damaging behavior; intense or unstable personal relationships; psychomotor retardation; social withdrawal or isolation; visual hallucinations; and both decreased need for sleep and excessive sleep.  *Id*. at 2412.  The most frequent and severe of these symptoms were Plaintiff's "depression, isolating [sic], low self-esteem, feeling sad. [She] also has paranoia almost daily that interferes with daily living activities."  *Id*. at 2413.  Luneke indicated that Plaintiff's anger and irritability had previously caused her to lose a job.  *Id*.

Checkmarks reveal that, in Luneke's and Dr. Reynolds' opinions, Plaintiff had marked limitation in her ability to get along with coworkers or peers without distracting

6

them.  And she had marked to moderate limitations in her abilities to interact appropriately with the public, maintain socially appropriate behavior, travel to unfamiliar places or use public transportation, and set realistic goals.

Luneke and Dr. Reynolds opined and that Plaintiff would likely be absent from work more than three times a month due to her impairments or treatment.  And they believed that Plaintiff's symptoms and related limitations existed as far back as September 14, 2012.  *Id*. at 2415.

### III.  Standard of Review and ALJ Kenyon's Decision

Review of ALJ Kenyon's decision considers whether he applied the correct legal standards and whether substantial evidence supports his findings.  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance...."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Lawson v. Comm'r of Soc. Sec.*, 3:17cv119, 2018 WL 3301421, at *4 (S.D. Ohio 2018) (Ovington, M.J.), *Report & Recommendations adopted*, 2018 WL 3549787, at *1 (S.D. Ohio  2018) (Rice, D.J.).

ALJ Kenyon considered the evidence and evaluated Plaintiff's disability status under each of the five sequential steps set forth in Social Security Regulations.  *See* 20 C.F.R. § 416.920.  His more pertinent findings began at step two where he found that Plaintiff had numerous severe impairments, including (in part) "obesity, asthma, bipolar disorder, an anxiety disorder, and a personality disorder."  (Doc. #7, *PageID* #61).  At

7

step three, the ALJ concluded that Plaintiff's impairments did not automatically qualify her for benefits. *Id*. at 662-64.

At step four, the ALJ concluded that the most Plaintiff could do (her "residual functional capacity," *see Howard v. Comm'r of Soc. Sec*., 276 F.3d 235, 239 (6th Cir. 2002)), consists of light work with many limitations. He found in part:

> The claimant is limited to performing unskilled, simple, repetitive tasks; occasional contact with coworkers and supervisors; no public contact; no teamwork or tandem tasks; no fast paced production work or jobs which involve strict production quotas; and … jobs in a relatively static work environment in which there is very little, if any, change in the job duties or the work routine from one day to the next.

(Doc. #7, *PageID* #64).

The ALJ found at step five that Plaintiff can perform many jobs (well over a million) that exist in the national economy. These main findings led the ALJ to ultimately conclude that Plaintiff was not under a benefits-qualifying disability and not eligible to receive Supplemental Security Income. *Id.* at 68-69.

**IV.  Discussion**

Plaintiff contends that, in conflict with the Regulations, the ALJ dismissed treating psychiatrist Dr. Reynolds' opinions without providing good reasons for doing so. Plaintiff says the ALJ instead provided just a few conclusory sentences when weighing Dr. Reynolds' opinions. Plaintiff further contends that the ALJ failed to properly consider the opinions provided by Van Ausdal and Luneke by providing only curt and dismissive reasons and by overlooking the narrative information they provided.

The Commissioner maintains that the ALJ reasonably declined to place significant

8

weight on Dr. Reynolds' opinions because he endorsed Van Ausdal's questionnaire after the ALJ's hearing and because the questionnaire reflected Plaintiff's "reaction to acute situational stressors, not her day to day level of functioning…." (Doc. #11, *PageID* #3104). The Commissioner further argues that the ALJ reasonably weighed Van Ausdal's opinions by correctly noting that she was not an acceptable medical source and by applying various regulatory factors, including for instance, specialization, supportability, consistency, frequency of treatment. The Commissioner maintains that the ALJ properly found that Luneke was not an acceptable medical source and based her opinions on her uncritical acceptance of Plaintiff's subjective complaints.

A. **Medical-Source Opinions**

Social Security Regulations require ALJs to adhere to certain standards when weighing the opinions of acceptable medical sources, like Dr. Reynolds. "Key among these is that greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule." *Rogers,* 486 F.3d at 242 (citations omitted). The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20 C.F.R. § 404.1527(c)(2) ); *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 723 (6th Cir. 2014). If the treating medical source's opinion is not controlling, "the ALJ, in determining how much weight is appropriate, must consider a host of factors, including

9

the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers v. Commissioner of Social Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (citation omitted); *see Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (quoting, in part, 20 C.F.R. § 404.1527(d)(2)).

"[T]he ALJ must provide 'good reasons' for discounting treating physicians' opinions, reasons that are ' sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (quoting, in part, Soc. Sec. R. 96-2p, 1996 WL 374188, at *5 (July 2, 1996)).

The opinions of a non-acceptable medical source—like, Van Ausdal and Luneke—are "not entitled to any particular weight or deference." *Noto v. Comm'r of Soc. Sec.*, 632 F. App'x 243, 248-49 (6th Cir. 2015).

> [I]n some cases a non-acceptable medical source may have an insight as to the claimant's impairment that outweighs even a treating source's opinion depending on the nature of her treatment relationship with the claimant and the quality and supportability of her opinion. Thus, "[o]pinions from these medical sources ... are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." Finally, "the adjudicator generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that discussion of the evidence in the determination or decision allows a claimant and subsequent reviewer to follow the adjudicator's reasoning[.]"

*Id*. (quoting Soc. Sec. R. 06-03p, 2006 WL 2329939, *3, *5 (Aug. 9, 2006)).

**B.     Dr. Reynolds, Van Ausdal, Luneke**

The ALJ concluded that Van Ausdal's opinions, in the April 2014 questionnaire,

10

deserved little weight. He reasoned that the opinions Van Ausdal expressed by checkmarks lacked substantiating evidence. He further saw a conflict between Van Ausdal's representation that Plaintiff was seen for treatment every four weeks and the five-month gap in treatment that occurred before Van Ausdal completed the questionnaire in April 2014. He also observed: (1) Van Ausdal is a nurse and, therefore, "not an acceptable medical source entitled to opinion weight…," (2) her opinions in April 2014 reflect Plaintiff's mental functioning at a time when she was purportedly suicidal rather than "when she was not experiencing acute situational stress…." (Doc. #7, *PageID* #67).

As to Dr. Reynolds, the ALJ noted that it is unclear when he signed the questionnaire Van Ausdal had completed and that the questionnaire with his signature was re-submitted after the ALJ's hearing. The ALJ also wrote the following about Dr. Reynolds' April 2014 opinions: "Nor can Dr. Reynolds's subsequent endorsement of the form be afforded significant weight even though he is an acceptable medical source as the opinions stated on the form reflect the claimant's reaction to acute situational stressors and not her day to day level of functioning." *Id*.

Luneke's June 2015 opinions also fared poorly, in the ALJ's eyes. He gave her opinions little weight because they appeared to be "based on an uncritical acceptance of the claimant's subjective complaints." *Id*. at 68. And Dr. Reynolds' endorsement of Luneke's June 2015 report was "inconsistent with the objective medical evidence and the claimant's day to day functioning when not experiencing acute situational stressors." *Id*.

The ALJ's reasons for discounting Dr. Reynolds' opinions fail to recognize his

11

status as Plaintiff's treating psychiatrist. This constitutes error because there is no indication in the ALJ's decision that he weighed Dr. Reynolds' April 2014 or June 2015 opinions under the legal criteria applicable under the treating physician rule. *See Gayheart*, 710 F.3d at 376.

The Commissioner contends that if it was error for the ALJ to not realize Dr. Reynolds was a treating psychiatrist, the error was harmless because the ALJ "clearly considered [Dr. Reynolds' opinion] and declined to afford it significant weight based on the evidence." (Doc. #11, *PageID* #3105). This characterization is too generous to the ALJ. It essentially says that all an ALJ must do when weighing a treating source's opinion is to consider it—of course he must—and assign weight to it—of course he must. If this sufficed to show harmless error, both the treating physician rule, the other regulatory factors, and the good-reason requirement would be undermined. In addition, Dr. Reynolds' opinions are the only treating source opinions in the record that address Plaintiff's mental impairments and mental-work limitations. And Dr. Reynolds' opinions, if fully credited, would establish that Plaintiff is under a disability. Plaintiff therefore suffered prejudice as a result of the ALJ failure to recognize Dr. Reynolds' status as a treating medical source. *Cf. Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004) ("if a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it, a failure to observe § 1527(d)(2) may not warrant reversal.").

Even if the ALJ had not erred as just described, substantial evidence fails to support his other reasons for placing little weight on Dr. Reynolds' opinions. There is no

12

reasonable support for the ALJ's finding that Dr. Reynolds' opinions were inconsistent with the objective medical evidence. The ALJ fails to point to inconsistent objective evidence and the both the April 2014 and June 2015 forms identify numerous signs of Plaintiff's mental impairments—to name just a few, poor memory, emotional lability, psychomotor retardation, social withdrawal and self-isolation, and blunt, flat or inappropriate affect. *See supra*, § II(B). There is also no reasonable support for the ALJ's criticism that Dr. Reynolds only considered Plaintiff's mental impairments during a time when she was experiencing acute situational stressors, rather than addressing her day-to-day functioning. Yet, neither form that Dr. Reynolds signed asked him to limit his opinions to a time when she was experiencing acute situational stressors, and Dr. Reynolds did not indicate on either form that he was limiting his opinions to such times.

The ALJ likewise dismissed Dr. Reynold's opinion in the questionnaire he co-signed with Van Ausdal because it appears earlier in the record without Dr. Reynolds' signature and was later re-submitted with his signature. The ALJ reasoned that because Dr. Reynold's did not initially sign the form, the opinions are those of Van Ausdal, not Dr. Reynolds. But, Dr. Reynolds' signature on both the April 2014 and June 2015 forms was an obvious adoption of the opinions the form contained, thus triggering the need for the ALJ to review Dr. Reynolds' opinion under the treating physician rule and, if the treating physician rule did not apply, under the remaining factors. *See Snell v. Comm'r of Soc. Sec.*, 3:12cv119, 2013 WL 372032, at *10 (S.D. Ohio 2013) (finding that although Plaintiff never saw the doctor, his co-signature on the questionnaire previously completed by the nurse practitioner indicated that he agreed with her conclusions.); *see also Brock v.*

13

*Colvin*, 2:10cv075, 2013 WL 4501333, at *6 (M.D. Tenn. 2013) ("the doctor's decision to co-sign a letter from a nurse practitioner indicates an agreement with the opinions expressed in the letter.").

To the extent the ALJ relied on "situational stressors" as medically significant, the ALJ erred. "Such a finding clearly indicates that the ALJ inserted his own non-medical opinion as to what defines depression, and what stressors appropriately cause depression." *Barnhorst v. Comm'r of Soc. Sec.*, 1:10cv526, 2011 WL 3811462, at *17 (S.D. Ohio 2011), *Report and Recommendation adopted*, 2011 WL 3812639, at *1 (S.D. Ohio 2011).

Accordingly, Plaintiff's Statement of Errors is well taken.[3]

## V. Remand

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746. Remand may be warranted when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff lacks credibility, *see*

---

[3] In light of the above discussion, and the resulting need to remand this case, an in-depth analysis of Plaintiff's other challenges to the ALJ's decision is unwarranted.

*Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence 4 may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is warranted in the present case because the evidence of disability is strong while contrary evidence is lacking. Dr. Reynolds' opinions are the only treating source opinions in the record concerning Plaintiff's mental impairments and mental-work limitations. His opinion that Plaintiff would be absent three or more times per month is strongly supported throughout Plaintiff's treatment records, her sporadic short-term work history, her testimony, and the opinions provided by Van Ausdal and Luneke. Additionally, the vocational expert testified that it would be difficult for someone with Plaintiff's limitations to sustain competitive work when absent from work three or more days a month. (Doc. #7, *PageID* #105). The same goes for a person who was off task twenty percent of the workday, and someone who is not able to respond appropriately to work feedback. Id. at 105-06.

The contrary evidence includes opinions provided by record-reviewing psychologists Robyn Hoffman, Psy.D., and Leslie Rudy, Ph.D. *Id*. at 152-53, 175-76.

15

But the ALJ gave their opinions little weight because they merely adopted the previous (September 2013) assessment of Plaintiff's mental residual functional capacity under *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997) and new and material evidence warranted further mental limitations. *Id*. at 67.

Accordingly, the evidence of Plaintiff's disability is strong while contrary evidence is lacking.

## IT IS THEREFORE RECOMMENDED THAT:

1. The Commissioner's final non-disability decision, dated December 22, 2016, be vacated;

2. Findings be made that Plaintiff Africa N. Whitfield is under a disability and eligible to receive Supplemental Security Income based on the application she protectively filed on February 28, 2014;

3. This matter be REMANDED to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for payment of benefits; and

4. The case be terminated on the Court's docket.


September 11, 2019                               *s/Sharon L. Ovington*
                                                 Sharon L. Ovington
                                                 United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).